UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JORGE FONSECA and REYES ANDON on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>DIRCKSEN & TALLEYRAND INC. d/b/a RIVER CAFE and MICHAEL "BUZZY" O'KEEFE,<br><br>Defendants. | Index No. 13-CV-5124 (AT) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR CONDITIONAL COLLECTIVE CERTIFICATION
PURSUANT TO 29 U.S.C. SEC 216(B)**

LITTLER MENDELSON, P.C.
900 Third Avenue
New York, New York 10022

*Of Counsel*
Craig R. Benson
Sarah E. Moss

1

TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ................................................................. 2

II.  BACKGROUND FACTS ....................................................................... 3

  A.  The River Café ........................................................................... 3

  B.  Staffing at the River Café ............................................................ 4

  C.  The River Café's Hiring and Termination Process.......................... 5

  D.  The Tip Share System ................................................................. 6

  E.  The River Café's Time-Keeping System ....................................... 7

III.  LEGAL ARGUMENT ......................................................................... 7

  A.  Legal Standard for Conditional Certification Under 29 U.S.C. § 216(b) ............. 7

  B.  Plaintiffs Are Not Entitled To Conditional Certification...................... 9

    1.  Conditional Certification Should Be Denied Because of an Inherent Conflict Among Plaintiffs and Putative Collective Members ............................................................................ 9

    2.  Conditional Certification Should Be Denied Because Plaintiffs Have Not Demonstrated that the Tip Share System Was Mandated by the Employer........................................ 10

    3.  Conditional Certification Should Be Denied Because the Maître Ds are Not "Employers" Under the FLSA ................................... 13

    4.  Plaintiffs Are Not Similarly Situated To The Putative Collective With Respect To Their Unpaid Wage Claims ........................ 16

  C.  Plaintiffs' Proposed Notice Should Be Stricken................................ 18

    1.  Plaintiffs' Request For Putative Collective Members' Personal Information Should Be Denied ................................... 18

    2.  Plaintiffs' Request for Six (6) Years of Information Should Be Denied ....................................................................... 19

    3.  Plaintiffs' Request to Post Notice Should be Denied .............. 20

  D.  Plaintiffs' proposed Consent Form Should Be Amended................... 21

**TABLE OF CONTENTS**
(CONTINUED)

E.    Plaintiffs' Request  for Equitable Tolling Should be Denied ............................ 21

F.    Plaintiffs' Counsel Should Not Be Permitted To Control The  Notice Process .......................................................................................................... 22

IV.    CONCLUSION ............................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arencibia v. 2401 Rest. Corp.*,
  831 F. Supp. 2d 164 (D. D.C. 2011) ......................................................................13

*Barfield v. New York City Health & Hosps. Corp.*,
  2005 U.S. Dist. LEXIS 28884 (S.D.N.Y. Nov. 17, 2005) ......................................8

*Bowens v. Atl. Maint. Corp.*,
  546 F. Supp. 2d 55 (E.D.N.Y. 2008) ....................................................................22

*Diaz v. Elecs. Boutique of Am., Inc.*,
  2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005) ....................................16

*Fasanelli v. Heartland Brewery, Inc.*,
  516 F. Supp.2d 317 (S.D.N.Y. 2007).....................................................................19

*Gillian v. Starjem Rest. Corp.*,
  2011 U.S. Dist. LEXIS 115833 (S.D.N.Y. Oct. 4, 2011) (Rackoff, J.).......................10, 16, 17

*Gillian v. Starjem Rest. Corp.*,
  Case 1:10-cv-06056-JSR, Doc. No. 40, at p. 4 (S.D.N.Y. Mar. 21, 2011)………………… 17

*Gordon, et al. v. Kaleida Health, et al.*,
  2009 U.S. Dist. LEXIS 95729 (W.D.N.Y. Oct. 14, 2009) ....................................19

*Hallissey v. America Online, Inc.*,
  2008 U.S. Dist. LEXIS 18387 (S.D.N.Y. Feb. 19, 2008)......................................22

*Herman v. RSR Security Servs. Ltd.*,
  172 F.3d 132 (2d Cir. 1999).................................................................................13

*Hernandez v. Merrill Lynch & Co.*,
  2012 U.S. Dist. LEXIS 49822 (S.D.N.Y. April 6, 2012) ......................................20

*Hinterberger, et al. v. Catholic Health Sys., et al.*,
  2009 U.S. Dist. LEXIS 97944 (W.D.N.Y. Oct. 21, 2009) .........................19, 21, 22

*Karvaly v. eBay, Inc.*,
  245 F.R.D. 71 (E.D.N.Y. 2007) .....................................................................19, 20

*Morales v. Plantworks, Inc.*,
  2006 U.S. Dist. LEXIS 4267 (S.D.N.Y. June 12, 2006) ........................................8

TABLE OF AUTHORITIES
(CONTINUED)

PAGE(S)

*Myers v. Hertz Corp.*,
　　624 F.3d 537 (2d Cir. 2010)..........................................................................8

*Pearl v. City of Long Beach*,
　　296 F.3d 76 (2d Cir. 2006).........................................................................21

*Rudy v. Consol. Rest. Comps., Inc.*,
　　2010 U.S. Dist. LEXIS 92764 (N.D. Tex. Aug. 18, 2010).......................13, 14, 15

*Shajan, et al. v. Barolo, Ltd., et al.*,
　　2010 U.S. Dist. LEXIS 54581 (S.D.N.Y. June 2, 2010) ...........................19

*Strait v. Belcan Engineering Group, Inc.*,
　　2012 U.S. Dist. LEXIS 169390 (N.D. Ill. Nov. 29, 2012)..................8, 16

*Turner v. Millennium Park Joint Venture, LLC*,
　　767 F. Supp. 2d 951 (N.D. Ill. 2011) ...................................................10, 11, 12

**STATUTES**

29 U.S.C. § 216(b) (the "Motion") ..................................................... passim

**OTHER AUTHORITIES**

DOL FIELD OPERATIONS HANDBOOK § 30d04(c) ........................................11

## I.    PRELIMINARY STATEMENT

On November 25, 2013, Plaintiffs Jorge Fonseca and Reyes Andon ("Plaintiffs") filed their motion to conditionally certify a collective action under 29 U.S.C. § 216(b) (the "Motion"). Defendants Dircksen & Talleyrand, Inc. and Michael O'Keeffe ("Defendants") submit this opposition to the Motion and respectfully request that the request to send notice be denied.

Plaintiffs' first claim arises from their allegations that the tip pool system used by the wait staff at the River Café was tainted by the inclusion of three tip ineligible positions:  maître ds, a "polisher," and an "expediter."   These allegations are demonstrably false for several reasons.  First, two of the allegedly tip ineligible positions were filled by members of the putative collective during the application limitations period, riddling the proposed collective with unavoidable conflicts of interest.  Second, although a "polisher" was hired by Defendants in 2011, it was done so at the behest of the wait staff, who wanted a dedicated polisher who they would include in the tip pool at a lesser share than the bussers who had previously rotated through the position.  This arrangement, done at the request of, and for the benefit for,  the wait staff, is entirely proper and legal, and cannot form the basis of a 216(b) collective action.  Third, the maître ds are tip eligible employees who are properly included in a tip pool.  Thus, Plaintiffs have failed to demonstrate a common policy or plan that violates the law, and their Motion to certify their tip pool claims should be denied.

Plaintiffs' second claim arises from their allegations that they were paid at a shift rate for their work at the restaurant and that the shift rate under-compensated them for the time that they worked.  Defendant maintains that the shift pay was sufficient to cover all hours that were worked.  Plaintiffs' claim otherwise, but regardless, their claim in this regard is entirely unsuitable for collective treatment because they are not similarly situated to one another and whether there was a violation on any given shift  requires an analysis of each individual's work

day to determine whether they were not paid for some time worked.  This is not a case where the Plaintiffs all worked a set shift, and so their allegedly unpaid hours could be calculated easily and in a uniform manner.  Rather, the hours worked by any given Plaintiff, on any given day, varied.  As a result, whether the River Café is liable to any individual will require a thorough analysis of that individual's particular circumstances – an outcome that is hardly suitable for collective treatment and the fair and efficient adjudication of each individual's claims. Moreover, the River Café provided a timekeeping system that the Plaintiffs and putative collective members were able to use to accurately record their hours.  Each Plaintiff could choose which option was more economically advantageous – clocking in and being paid pursuant to what was recorded on the time clock, or taking the shift pay.  Once again, the result is a putative collective that is not similarly situated to one another—a necessary prerequisite to relief that is sought.  For the aforementioned reasons, Defendants respectfully request that Plaintiffs' Motion be denied.

## II.   BACKGROUND FACTS

### A.   The River Café

The River Café is a restaurant in Brooklyn, New York overlooking the East River, with a view of Manhattan's eastern skyline.  It was established in 1977 by owner Michael O'Keeffe. Declaration of Richard Dean ("Dean Dec.") ¶ 3.[1]  In October 2012, it closed its public dining room as a result of severe damage sustained during Hurricane Sandy.  *Id.* at ¶ 4.  The River Café recently opened its dining room for limited public dining.  *Id*. at ¶ 5.

Scott Stamford has been the General Manager of the River Café since 1999.  Declaration of Scott Stamford ("Stamford Dec.") ¶ 2.  Mr. Stamford began working at the River Café as a valet when the River Café opened in 1977.  *Id.* at ¶ 3.  He was then promoted to bartender and, in

---

[1] The Declaration of Mr. Dean and the Declaration of Mr. Stamford are attached to the Declaration of Craig Benson.

3

1999, was promoted to General Manager, a position that he has retained to date.  *Id.*

**B.     Staffing at the River Café**

When the River Café was fully-functioning, it was open for lunch and dinner Monday through Saturday and was open for brunch and dinner on Sunday.  *Id.* at ¶ 4.  The hours of each shift varied, on a daily basis, based largely on when the guests arrived and how long they dined. Most of the wait staff typically arrived for a lunch shift between 10:00 and 10:30 a.m. and left between 3:00 p.m. and 4:30 p.m.  *Id* at ¶ 5.  The waiter scheduled to close the lunch shift generally began working at 11:00 a.m.  *Id.* at ¶ 6.  Wait staff typically arrived for a dinner shift between 4:00 and 4:30 p.m. and left between 11:00 p.m. and 12:00 p.m.  *Id.* at ¶ 7.  The closing waiter on the dinner shift would generally begin working between 5:00 and 5:15 p.m., though would sometimes begin working as late as 6:00 p.m. if the waiter was also the closing waiter for the lunch shift.  *Id.* at ¶ 8.

The River Café's dining room was staffed by waiters, back waiters, bussers, captains, bartenders, and maître ds.  *Id.* at ¶ 9.  Prior to the River Café's closure in October 2012, there were two maître ds who worked in the restaurant, Patrick Goubit and Javier Rodriguez.  *Id.* at ¶ 10.  The maître ds' job duties were an integral part of the service team.  Their functions included, greeting guests, interacting with guests, organizing the dining room seating, running food, bussing food, handing menus to guests, and deciding where guests would be seated.  *Id.* at ¶ 11. The maître ds would also make the front of house schedule.  *Id.*

Until approximately 2011, bussers would rotate in a "floater" assignment that would assist the service by polishing (wiping it off prior to placing it on the table) silverware and do general stocking duties of the dining room during the service.  *Id.* at ¶ 12.  This position received a full busser share from the tip pool.  *Id.*  In or around 2011, captains and waiters approached Mr. Stamford about the "floater" assignment.  *Id.* at ¶ 13.  The captains and waiters asked him to

4

create a new "polisher" position, whose responsibilities would be limited to polishing.  *Id*. at ¶ 14.  The captains and waiters recommended a dishwasher named Elesio.  *Id*. at ¶ 15.  At the captains' and waiters' suggestion, Mr. Stamford offered the "polisher" position to Elesio.  *Id*. at ¶ 16.  The idea to include Elesio in the tip share system was entirely the wait staff's, who decided to give Elesio half of a busser's share of the tip pool, thereby enabling the rest of the wait staff to retain the other half of the busser's share of the tip pool.  *Id*. at ¶ 17.  Elesio did not perform dishwashing duties after he was elevated to the polisher position.  *Id*. at ¶ 18.

The River Café does not employ an "expediter."  *Id*. at ¶ 19.  Rather, the River Café had a back waiter position, whose job duties were to run food from the kitchen to the dining room.  *Id*. at ¶ 20.  Plaintiff Reyes Andon and opt-in Mark James worked as back waiters in this capacity.  *Id*. at ¶ 21.  Other waiters who worked in the front of the house would also sometimes work as back waiters, depending on the shift.  For example, Pedro Alonso, referenced on page 7 of Plaintiffs' Motion, would sometimes work as a waiter in the front of the house.  *Id*. at ¶ 22.

## C.   The River Café's Hiring and Termination Process

As the General Manager, Mr. Stamford conducts all of the hiring, including interviewing all candidates for front of house positions and making the decision to hire or not to hire each candidate.  *Id*. at ¶ 23.  Mr. Stamford received resumes from candidates and received recommendations directly from members of the wait staff.  *Id*. at ¶ 24.  Based on the candidate's resume, Mr. Stamford would make a decision whether to interview the candidate.  *Id*. at ¶ 25.  Except in rare circumstances, Mr. Stamford interviewed all of the candidates.  *Id*. at ¶ 26.

Mr. Stamford would sometimes involve other members of the wait staff if a candidate listed another language on his or her resume.  For example, when a candidate listed Spanish on his or her resume, former maître d Javier Rodriguez would be asked to speak with the candidate and confirm his or her proficiency.  *Id*. at ¶ 27.  This was not unique to maître ds; when a

candidate listed Portuguese on his or her resume, Mr. Stamford would ask a captain named Silaine Sousa to speak with the candidate to confirm his or her proficiency. *Id*. at ¶ 28.

After interviewing a candidate, Mr. Stamford would decide whether to offer the candidate a trial period at the River Café. *Id*. at ¶ 29. During the candidate's trial period, Mr. Stamford would speak with the wait staff, usually captains, about the candidate and whether the candidate was qualified for the position. *Id*. at ¶ 30. After the training period ended, Mr. Stamford made the decision whether to hire the candidate. *Id*. at ¶ 31. Mr. Stamford communicated the decision to the candidate, usually by telephone. *Id* at ¶ 32. The only time Mr. Stamford would ask another employee to communicate the decision was when the candidate's primary language was not English, in which case Mr. Stamford would ask someone from the wait staff who spoke that language to communicate the decision. *Id*. at ¶ 33. This had nothing to do with any managerial aspect of the roles in question – it was purely a matter of linguistics.

Similarly, Mr. Stamford and Mr. O'Keeffe make all termination decisions for front of house staff at the River Café. *Id*. at ¶ 34. Typical reasons for termination include poor service, stealing, tardiness, and customer complaints. Mr. Stamford personally investigates customer complaints by speaking with members of the wait staff, and makes a disciplinary determination based on his investigation. *Id*.

## D.    The Tip Share System

The tip share system at the River Café was created by the wait staff when the restaurant opened. The tip share system is completely operated and maintained by the wait staff without the involvement from the restaurant's management. *Id.* at ¶ 35. To Defendants knowledge, Plaintiff Reyes Andon was one of the waiters in charge of counting and distributing the tips. *Id.* at ¶ 36. Like waiters and captains, the maître ds were among the service employees who received tips directly from customers. These tips became part of the tip share, which were

6

redistributed to other members of the wait staff.  *Id.* at ¶ 37.  On information and belief, the maître ds received more than $30 per month in tips directly from customers.  *Id.* at ¶ 38.

Changes to the tip share were entirely within the control of the service staff.  They had complete discretion of which positions were included and the shares that were provided to participants.  *Id.* at ¶ 39.  The wait staff could also change how the tip pool money was distributed.

**E.     The River Café's Time-Keeping System**

The River Café has a time clock that employees are encouraged to use in order to record their work time.  Dean Dec. ¶ 6.  Employees who utilize the time-keeping system are paid in accordance with their time records.  *Id.* at ¶ 7.  Except for bartenders and captains, wait staff who fail to clock in and out are paid for five (5) hours for a week-day lunch shift (Monday-Friday) and six (6) hours for a Saturday or Sunday lunch shift.  *Id.* at ¶ 8.  Wait staff, except for bartenders and captains, are paid for eight (8) hours for a dinner shift, regardless of on which day of this week the shift occurs.  *Id.*  Bartenders are paid eight (8) hours for a single shift and twelve (12) hours for a double shift.  *Id.* at ¶ 9.  Captains are paid seven (7) hours for each shift.  *Id.* at ¶ 10.  The shift pay is designed to provide, at least, the applicable minimum wage for all hours of work. *Id.* at ¶ 11.  No employee has ever complained to Mr. Stamford about not being paid for hours worked.  Stamford Dec. ¶ 40.  Typically, new employees use the River Café's time-keeping system, which is integrated with the River Café's point of sale system, for the first month or so of employment, then stop, presumably because they are paid more by not clocking in and receiving the shift pay.  Dean Dec. ¶ 12.

### III.     LEGAL ARGUMENT

**A.     Legal Standard for Conditional Certification Under 29 U.S.C. § 216(b)**

The FLSA authorizes a plaintiff to file suit on behalf of "other employees similarly

situated," but only if such employees "consent in writing." 29 U.S.C. § 216(b).  Court-ordered

notice is not automatic. Rather, while "district courts have the discretion, in appropriate cases ...

to facilit[ate] notice to potential plaintiffs"; they "are not required to do so by [the] FLSA."

*Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (citing *Hoffman-LaRoche Inc. v.*

*Sperling*, 493 U.S. 165, 169 (1989)) (emphasis supplied).  In determining whether to exercise

this discretion, a district court can consider whether facilitating notice "may be a useful 'case

management' tool," but it is "neither necessary nor sufficient" for maintaining a representative

action.  *Myers*, 624 F.3d at 555, n. 10 (citing *Hoffman-LaRoche Inc.*, 493 U.S. at 169, 174).

Before a court will authorize such notice, a plaintiff "must demonstrate, based on pleadings and

affidavits, that she is similarly situated to potential collective members." *Myers*, 624 F.3d at 554-

55.

        Plaintiffs must establish similarly situated status through a factual showing, not simply

allegations. *See Barfield v.  New York City Health & Hosps. Corp.*, 2005 U.S. Dist. LEXIS

28884, at *3 (S.D.N.Y. Nov. 17, 2005).  To meet their burden in this regard, Plaintiffs must do

more than allege the existence of a lawful common policy or practice. Instead, they must put

forth evidence "sufficient to demonstrate that plaintiffs and potential collective members were

victims of a common scheme or plan that violated the law."  *Morales v. Plantworks, Inc.*, 2006

U.S. Dist. LEXIS 4267, at *7 (S.D.N.Y. June 12, 2006) (emphasis added).  Moreover, though a

common question may exist among putative collective members, the Court must determine

whether that common question can be "answered without individual inquiries." *Strait v. Belcan*

*Engineering Group, Inc.*, 2012 U.S. Dist. LEXIS 169390, at * 13 (N.D. Ill. Nov. 29, 2012).

**B.**     **Plaintiffs Are Not Entitled To Conditional Certification**

1.     Conditional Certification Should Be Denied Because of an Inherent Conflict
Among Plaintiffs and Putative Collective Members

The putative collective of waiters, runners, bussers, and bartenders are not similarly situated with regard to a central claim at issue in this case – the legality of the participants in the tip pool. Plaintiffs allege that polishers and "expediters"[2] do not participate in the service and are, therefore, not properly included in the tip pool. The polisher position was an assignment rotated among bussers, a position included in the putative collective. Similarly, the back waiter position is an assignment rotated among front of house waiters, also a position included in the putative collective. Thus, the same people who acted as busboys, acted as polishers. Likewise, the same people who acted as front waiters also acted as back waiters. This fact presents an irreconcilable conflict for Plaintiffs.

The conflict exists because Plaintiffs seek to represent not only the very same waiters who act as alleged expediters/back waiters, but also the group of bussers employed at the River Café who acted as polishers. (Plaintiffs' Motion, p. 1). Any putative collective member who occupied the assignments in question have a vested interest in their participation in the tip pool being validated. Plaintiff Reyes Andon and opt-in plaintiff Mark James exemplify this conflict: They both worked as front waiters and back waiters, and thus have a vested interest in the back waiter position being tip eligible. Their position is contrary to that of the other Plaintiffs, who worked only as front waiters and bartenders and have a vested interest in the back waiter position being ineligible. Their position is also contrary to that of the bussers, who, having rotated into the polisher assignment, have a vested interest in that position being tip eligible. Their interests in this regard are not aligned.

---

[2] As explained in Section I.B, the River Café does not have an "expediter" position; the position that most closely resembles Plaintiffs' allegations is the back waiter position, a position which rotated among front of house waiters.

The same conflict was at issue in *Gillian v. Starjem Rest. Corp.,* 2011 U.S. Dist. LEXIS 115833 (S.D.N.Y. Oct. 4, 2011) (Rackoff, J.).   In *Gillian*, the plaintiffs sought conditional certification of their claim that the tip pool included tip-ineligible "stockers and expediters."  *Id*. at *19-20.   The court rejected this claim, finding that, "since the stocker position is rotated among busboys and since the expediter position is rotated among runners, plaintiffs cannot fairly represent busboys and runners, because busboys and runners also serve as stockers and expediters and thus have an interest in their participation in the tip pool being validated.  *Id.* at *20.

Here, the plaintiffs cannot fairly represent bussers, who rotated in the "stocker" assignment, nor can they represent any waiter who rotated in the back waiter assignment, as they have an interest in their participation in the tip share being validated.   Due to this inherent conflict, which puts the interests of putative collective members in direct opposition to the interest of other putative collective members, the potential collective members are not similarly situated within the meaning of § 216(b), and the Court should deny Plaintiffs' motion and refuse to circulate a notice of pendency.

2.     Conditional Certification Should Be Denied Because Plaintiffs Have Not
Demonstrated that the Tip Share System Was Mandated by the Employer

Even if Plaintiffs were somehow able to overcome the conflicts inherent to their proposed collective, Plaintiffs have failed to demonstrate that the tip share system used by the wait staff at the River Café was done so at the direction of management – a necessary prerequisite for any claim of illegality in this regard.  *Turner v. Millennium Park Joint Venture, LLC*, 767 F. Supp. 2d 951, 945-55 (N.D. Ill. 2011) (no unlawful policy where tips were voluntarily shared and were not mandated by the restaurant).   Indeed, the U.S. Department of Labor's Field Operations Handbook specifically contemplates situations in which service employees choose to share their

tips with otherwise ineligible employees, stating that, "It does not appear that the Congress, even in requiring as a general principle that tipped employees retain all their tips, intended to prevent tipped employees from ... sharing [their tips] with whichever coworkers they please."   DOL Field Operations Handbook § 30d04(c).

> a.    *The Tip Share System Was Voluntary and Created by The Defendants' Wait Staff*

Plaintiffs cannot prevail on their tip share claim because the only facts before this Court as to the creation of the tip share system demonstrate that the tip share system was voluntarily created, implemented, and run by the Defendants' wait staff, without the involvement of Defendants' management.  In *Turner*, the plaintiffs denied that the wait staff had voted to include a silverware roller in the tip share.  767 F. Supp. 2d at 953, n. 3.  However, the court refused to credit the plaintiffs' denial, noting that the plaintiffs had not been employed at the defendant's restaurant when the decision was made to include the silverware roller in the tip share.  Id.  The court further noted that the plaintiffs were unable to refute the affidavit testimony of the defendant's manager that the wait staff had voted to include the silverware roller. Such is the case here, where no Plaintiff was employed at the River Café when the tip share system was created and implemented.  As in Turner, the only evidence before this Court regarding the creation and implementation of the tip share system is from Mr. Stamford who, as a tipped employee at the opening of the River Café, has direct, personal knowledge of the creation of the tip pool.

Furthermore, it is clear from *Turner* that that Plaintiffs' were not required to individually assent to the tip share system in place at the River Café, nor of the inclusion of the polisher position.  In *Turner*, the court, commenting on the plaintiffs' "chutzpah," further held:

> as a matter of law that the very nature of the parties' employment
> relationship is such that no individual employee's separate

> agreement to the established arrangement was necessary to hold
> plaintiffs to it.  Instead the agreement was implied from the fact of
> plaintiffs having been hired with that across-the-board
> understanding in place, in much the same way that an existing
> collective bargaining agreement binds new hires into the
> bargaining unit."

*Id.*  The instant case is indistinguishable.  Because the tip share system at the River Café was entirely voluntary and under the sole control of the wait staff, conditional certification of Plaintiffs' tip share claim should be denied.

        b.      *The Polisher Was Included in the Tip Pool at the Request of the Wait Staff*

Plaintiffs' tip share claims also fail because the position at issue was included at the tip share at the service staff's behest.  Having already received the benefit of that bargain, in the form of retaining a greater share of tips for themselves and enabling them to avoid having to rotate in to the polisher assignment, Plaintiffs now seek to disavow this arrangement for yet more financial gain.  *Turner* squarely addressed this issue and is instructive here.

In *Turner*, the defendant's wait staff informed the defendant's management of their desire for the defendant to hire a separate silverware roller; to that point, silverware rolling had been a part of the server's job duties.  767 F. Supp. 2d at 952.  The defendant hired a silverware polisher, who was included in the tip pool and received $3 per day per server from the pool.  *Id.* at 953.  Interpreting the FLSA, the *Turner* court determined that "employees receiving tips directly from customers may agree to share tips when they believe that the employees with whom they share help them to serve the customers better and more fully and thus to obtain additional tips and sweeten the pot for everyone.  *Id.* at 954-55.  This is precisely the situation here, where the wait staff urged the River Café to hire a polisher to help them serve customers better, obtain additional tips, and keep more of the tip pool for themselves by giving the newly-hired polisher a smaller share than the bussers had received for doing the same functions.

12

Plaintiffs have provided no evidence that the tip share system at the River Café was involuntary, nor can they provide any facts contradicting Mr. Stamford's testimony that the tip share system was created by the wait staff. As a result, Plaintiffs have failed to establish that they are similarly situated as to a common policy or practice that violated the law, and conditional certification of this aspect of Plaintiffs' claim must be denied.

   3.   Conditional Certification Should Be Denied Because the Maître Ds are Not "Employers" Under the FLSA

Plaintiffs' bid for conditional certification of their tip share claim must also fail because they have not, and cannot, demonstrate that the alleged managers (who are actually maître ds) are "employers" within the meaning of the FLSA. *See Herman v. RSR Security Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) ("To be liable under the FLSA, a person must be an 'employer.'") To be an "employer" under the FLSA is to be *personally liable* for the unpaid or deficient wages of other employees and requires a showing that the person "possessed the power to control [the] workers in question. *Id*. The Second Circuit has identified four factors, collectively referred to as the economic realities test, for courts to consider when determining whether an alleged employer possesses the requisite power. *Id*. The four factors that courts consider are "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id*.

In light of the consequences of being an "employer," courts have, understandably, refused to apply this label to low-level supervisors. *See e.g., Rudy v. Consol. Rest. Comps., Inc.*, 2010 U.S. Dist. LEXIS 92764 (N.D. Tex. Aug. 18, 2010) (holding that even if a maître d was a low-level manager, she was not an "employer" under the FLSA); *Arencibia v. 2401 Rest. Corp.*, 831 F. Supp. 2d 164 (D. D.C. 2011) (maître ds were not employers under the FLSA because they

did not have the authority to hire, fire, or discipline without prior authorization, had little discretion in setting the work schedule, did not set employees' pay rates, and did not maintain employment records).  Thus, to be deemed an "employer" under the FLSA requires a far greater showing that hearsay statements and unsubstantiated allegations about power allegedly wielded by particular individuals.

In *Rudy*,  the sole issue was whether the maître ds were tipped employees or employers under the FLSA.   *Id.*  at *5.   There, it was undisputed that the maître ds had greater responsibilities within the restaurant, including "assuring the tables were set in accordance with guest requests, serving food and drinks to tables, greeting customers, checking on tables, and performing table visits if a guest had a problem or question during the dinner service."  *Id.* at *10.

Using the economic realities test to determine whether the maître d's were "employers" under the FLSA, the court determined that:  (1) even though the maître d's had the authority to interview potential new hires, because the final authority rested with the proprietor, that factor weighed against the maître d's being employers (*id.* at *20-22); (2) even if the maître d's had unfettered control over the servers work schedules, that factor weighed "if at all, only slightly" in favor of the maître d's being employers because making schedules does not affect the restaurant's compliance or non-compliance with the FLSA (*id.* at *24); (3) the maître d's did not set the servers' pay rate or the method of payment, weighing against finding they were employers (*id.* at *24-25); (4) the maître d's involvement with employment records was merely clerical, weighing against a finding that they were employers (*id.* at *25); and (5) the maître d's could comp food, open/close the restaurant, and reconcile the servers' receipts (*id.* at *26).  The court determined that based on the totality of circumstances, the maître d's "were no more than

14

low-level supervisors who were not responsible for FLSA compliance and thus were not employers under the FLSA." *Id.* at *26.

Thus, even taking as true Plaintiffs' allegations that the maître ds had complete control over the Plaintiffs' schedules, comped food, answered customer complaints, and even disciplined other members of the wait staff, such allegations are insufficient to demonstrate that the maître ds are "employers" under the FLSA.  In support of their allegations that the maître ds wielded even more authority, Plaintiffs provide nothing more than unsubstantiated allegations and hearsay, which were rejected in *Rudy* as "entirely conclusory," *Id.* at 19.[3]  Without the benefit of deposing the Plaintiffs, Defendants are unable to demonstrate that Plaintiffs' belief as to the maître ds' authority is merely that – a belief.  As described above, General Manager Scott Stamford is solely responsible for hiring and firing employees at the River Café, as well as for significant discipline such as suspension.  Plaintiffs have not, and cannot, provide any facts that refute Mr. Stamford's control over the front of house staffing at the River Café, nor have they provide any facts demonstrating that the maître ds exercise any other authority significant enough to render them "employers" under the FLSA.

The maître ds' participation in the tip share system at the River Café is <u>only</u> unlawful if the maître ds' are "employers" under the FLSA – an claim that was soundly rejected in *Rudy* on nearly identical allegations.  As a result, Plaintiffs have failed to demonstrate the existence of a common policy or plan that violates the law with respect to their claim concerning the maître ds, and their Motion should be denied.

---

[3] In *Rudy*, the plaintiffs' affidavits contained allegations, purported to be based on the affiants' personal knowledge, that the maître ds hired new employees.  Dismissing these allegations as conclusory, the court further noted that "No competent . . . evidence shows how the servers would have had any personal knowledge of the interactdion, or lack thereof, between the maître d's and the proprietor/general manager regarding the hiring process or any other of the maître d's actions."  2010 U.S. Dist. LEXIS 92764, at *19-20.

4.     Plaintiffs Are Not Similarly Situated To The Putative Collective With Respect To Their Unpaid Wage Claims

Plaintiffs have failed to establish that they are similarly situated to others in the putative collective with respect to their unpaid wage claims.  The determination of whether any plaintiff or putative collective member is entitled to any relief requires an individualized inquiry into not only how many hours each person worked in any given week, but also how long each person worked *on any given day* in order to determine whether that person was uncompensated for any work time.  Because there is no uniformity when it comes to how many hours are actually worked by each class member, there is no commonality in this regard.

Conditional certification is inappropriate where liability is dependent on so many individual factual assessments, even if the plaintiffs are subject to a common question. *See, e.g., Gillian,* 2011 U.S. Dist. LEXIS 115833, at *19 (whether the defendant's "alleged rules violated the minimum wage and overtime provisions of the FLSA depends on the number of hours each individual worked on a particular shift, as well as the number of hours each individual worked in a particular week"); *Diaz v. Elecs. Boutique of Am., Inc.*, 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005) (denying certification where plaintiff's claims required examination of when plaintiff and each class member was to work, when they actually worked, whether they were paid for such and whether their supervisor altered their timesheets).*Strait v. Belcan Engineering Group, Inc.*, 2012 U.S. Dist. LEXIS 169390, at *13-14 (N.D. Ill. Nov. 29, 2012) (denying conditional certification of the plaintiffs' overtime wage claim because in order to address whether the plaintiffs were properly classified was common, the Court had to conduct individualized inquiries into each plaintiffs' actual daily duties).

In *Gillian*, the plaintiffs sought 216(b) conditional certification of their unpaid minimum and overtime wage claims, which were premised in part on allegations that the plaintiffs were

paid shift pay, which resulted in them being under- or uncompensated for all hours worked. *See Gillian v. Starjem Rest. Corp.*, Case 1:10-cv-06056-JSR, Doc. No. 40, at p. 4 (S.D.N.Y. Mar. 21, 2011) ("Defendants pay tipped employees a set number of hours for each shift worked"). The *Gillian* plaintiffs alleged that they were paid five (5) or six (6) hours per shift, regardless of actual shift length. *Id.* at 5. The court denied the plaintiffs' motion for conditional certification of their unpaid wage claims, finding that whether the defendant's shift pay policy actually violated the FLSA was dependent on each individual, the number of hours he worked on a particular shift, and the number of hours he worked each week. *Id.*at *19. In sum, whether there was an actual legal violation was not a question that could be answered uniformly on behalf of the plaintiffs and the collective, and was therefore inappropriate for conditional certification.

Here, like *Gillian*, Plaintiffs allege that they were paid shift pay, in this case, five (5) hours for working a lunch shift and eight (8) hours for working a dinner shift. Plaintiffs do not mention several other ways in which they and members of the putative collective are paid. For example, the wait staff – except bartenders and captains – were paid for five (5) hours for lunch shifts Monday through Friday. For lunch shifts on Saturday and Sunday, they were paid for six (6) hours. Wait staff – again, except for bartenders and captains – were paid for eight (8) hours for a dinner shift, regardless of what day the shift occurred. By contrast, captains were paid for seven (7) hours per shift, regardless of the shift. Bartenders' pay was also different; they received pay for eight (8) hours for a single shift and twelve (12) hours for a double shift.

It is impossible to know, without examining each individual employee, whether this practice resulted in an FLSA violation for any individual employee, much less all employees, rendering Plaintiffs' claims unsuitable for collective action treatment. Moreover, because Plaintiffs purport to represent bartenders and in their collective action, the question of how

17

whether an FLSA violation occurred depends not only on the individual, the day, the shift, and the week, but also the individual's position and type of shift pay he or she received.  For example, a 6-hour lunch shift on a Monday might result in a violation for a busser, but would not be a violation for a bartender or a captain.  Clearly, this is wholly unsuitable for collective treatment.

In order to obtain conditional certification, Plaintiffs have the burden of demonstrating that this policy or practice, even if common, actually violated the law in a way that affected the entire putative collective.  Plaintiffs have failed to meet their burden with respect to this aspect of their claim.   As in *Gillian*, the very existence of an FLSA claim is dependent on the individual experience of each Plaintiff, each opt-in, and each putative collective member.  As noted by the Plaintiffs, the purpose of the collective action process is to enable the "efficient resolution in one proceeding of common issues of law and fact."  Plaintiffs' Motion, p. 9.  Here, there is no way of knowing whether there are "common issues of law and fact" without a detailed, fact-specific inquiry into each person's shift length on any given day.  As a result, Plaintiffs' claims are not amenable to collective action treatment, and their Motion should be denied.

**C.     Plaintiffs' Proposed Notice Should Be Stricken**

Although the River Café maintains that Plaintiffs' Motion should be denied, it must also be noted that Plaintiffs' proposed notice, posting request, and request for contact information far exceed what is necessary and typically sufficient to accomplish the goals of a 2169b) notice.

1.     Plaintiffs' Request For Putative Collective Members' Personal Information
        Should Be Denied

Plaintiff requests that Defendants produce "the names, last known  address, alternate address(es) (if any), all known phone numbers, all known e-mail addresses, dates and location(s) of employment, position(s) held, dates of birth, and social security numbers for all individual

18

[sic] employed in a tipped position at Defendants' Restaurant."  Plaintiffs' Motion, p. 17.  This request is overbroad, seeks unnecessary information, and is tantamount to a fishing expedition by Plaintiff's counsel to solicit collective members.

It is well-established that first-class mailing is the preferred method and that alternative forms of notification should not be used unless the plaintiff presents facts showing that such methods are necessary.  *See Shajan, et al. v. Barolo, Ltd., et al.*, 2010 U.S. Dist. LEXIS 54581, at *5 (S.D.N.Y. June 2, 2010); *Gordon, et al. v. Kaleida Health, et al.*, 2009 U.S. Dist. LEXIS 95729, at *35-36 (W.D.N.Y. Oct. 14, 2009); *Hinterberger, et al. v. Catholic Health Sys., et al.*, 2009 U.S. Dist. LEXIS 97944, at *40-41 (W.D.N.Y. Oct. 21, 2009); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 91 (E.D.N.Y. 2007).

Therefore, other than names and mailing addresses, the private and personal information requested by Plaintiff is unnecessary, overbroad and should not be disclosed.  *See Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp.2d 317, 324 (S.D.N.Y. 2007) (defendant should not provide private information such as social security numbers, telephone numbers, work location and dates of employment for notification purposes); *Hinterberger*, 2009 LEXIS 97944, at *36 ("The Court agrees that, in the interest of privacy, CHS need not produce phone numbers, social security numbers, dates of birth, and e-mail addresses."); *Gordon,* 2009 LEXIS 95729, at *31 (same).  Thus, Plaintiffs' request is overbroad and should be denied except as to names and mailing addresses.

2.      Plaintiffs' Request for Six (6) Years of Information Should Be Denied

Even assuming that Plaintiffs' Motion and their request for notice to be sent to putative collective members who worked within three years prior to the filing of the complaint are granted, Plaintiffs' request for six (6) years of names and contact information is overbroad and should be denied.  Plaintiffs seek an FLSA collective action for employees who worked on or

after July 23, 2010 – there is no logical reason why they would then require contact information for employees who worked between July 23, 2007 and July 22, 2010.  Plaintiffs are not seeking certification of their Rule 23 claims at this time, which are the only claims that have a 6 year limitations period.  It is unnecessarily costly and time-consuming to require Defendants to gather and provide information for employees who do not have legal claims that are the subject of the instant motion.

     3.    <u>Plaintiffs' Request to Post Notice Should be Denied</u>

Plaintiffs seek to post notice of the collective action on the River Cafe's premises. However, posting notice is not necessary where defendants provide sufficient contact information for potential collective members.  *Hernandez v. Merrill Lynch & Co.*, 2012 U.S. Dist. LEXIS 49822, at *21 (S.D.N.Y. April 6, 2012).

As discussed above, first-class mailing of the notice is the preferred method and alternative forms of notification (such as posting of the notice) should not be used unless the plaintiff presents facts showing that other methods are necessary.  See Shajan, 2010 LEXIS 54581, at *5; Gordon, 2009 LEXIS 95729, at *35-36; Hinterberger, 2009 LEXIS 97944, at *40-41; Karvaly, 245 F.R.D. at 91.

Courts have noted that where the only group likely to be reached by posting in an employer's place of business are current employees and the employer can provide accurate mailing addresses for such employees, making such posting at the place of business is unnecessary.  See Shajan, 2010 LEXIS 54581, at *5 ("Since all current employees will be receiving the notice [via first class mailing], there is no need to require defendants to post the notice in the workplace."); Gordon, 2009 LEXIS 95729, at *36-37 ("Moreover, the only group that will be reached by posting are current employees, who have an interest in providing their employer with an up-to-date mailing address. . . . For the reasons stated, I find that first class

mail is the 'best notice practicable' and should be sufficient to provide potential class members here the notice to which they are entitled."); Hinterberger, 2009 LEXIS 97944, at *40-42 (same).  Therefore, posting of the Notice is unnecessary and Plaintiff's request should be denied.

**D.     Plaintiffs' Proposed Consent Form Should Be Amended**

The proposed consent form filed by Plaintiffs as Exhibit 1 to the Josef Nussbaum declaration should be amended because it does not provide an option for a putative collective member to opt-in to the lawsuit without selecting Plaintiffs' counsel as their own counsel. Although the proposed notice mentions that a putative collective member may select his or her own counsel, it is not mentioned until page 4 of the notice, in which Plaintiffs' counsel assure putative members that "you do not need to hire your own lawyer because Counsel will be working on your behalf."  Putative class members should be fully advised of their ability to hire their own counsel and the consent form should be amended to include an option for putative collective members to opt-in without selecting Plaintiffs' counsel as their representatives.  This is particularly necessary because otherwise putative collective members will be in the position of having to select Plaintiffs' counsel without the information they need to determine whether that is in their best interest, such as a copy of the retainer agreement.

**E.     Plaintiffs' Request  for Equitable Tolling Should be Denied**

Plaintiffs seek to send notice to all putative collective members who worked on or after July 23, 2010.  However, notice is only appropriate to putative collective members who worked on or before three years prior to the date that the collective is certified.  Despite Plaintiffs attempt to portray equitable tolling as commonplace, Second Circuit precedent has established that equitable tolling should only be granted "where a plaintiff could show that it would have been impossible for a reasonably prudent person to learn about his or her cause of action."  *Pearl v.*

*City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2006) (quotation marks omitted); *see also*

*Hinterberger v. Catholic Health Sys.*, 2009 U.S. Dist. LEXIS 97944, at \*47-48 (W.D.N.Y. Oct.

21, 2009) (denying equitable tolling due to delays in litigation/motion practice).   In

*Hinterberger*, the court held that equitable tolling was inappropriate because the plaintiffs failed

to offer

> allegations or proof from which this Court can conclude that a
> reasonably prudent potential plaintiff would not have known of his
> or her right to receive overtime pay after 40 hours. Pursuit of that
> right is not dependent on the commencement or certification of a
> collective action, and a reasonably diligent person could have acted
> by pursuing an individual or collective action for relief.

2009 U.S. Dist. LEXIS 97944, at \*47-48.   Thus, notice, if granted, should only be sent to

putative collective members employed three years from the date that conditional certification is

granted.

**F.    Plaintiffs' Counsel Should Not Be Permitted To Control The    Notice Process**

Plaintiffs' proposed notice requires opt-in claimants to mail the consent form to

Plaintiffs' counsel, and not the Court.   By implication, it also appears that Plaintiffs will be

directly responsible for the distribution of the notice.   Courts regularly reject this proposed

procedure.   *See Bowens v. Atl. Maint. Corp.*, 546 F. Supp. 2d 55, 84-95 (E.D.N.Y. 2008)

(explaining "recent decisions have held that such a provision [forwarding consent forms to

plaintiff's counsel] improperly discourages class members from seeking outside counsel and

thus, courts have direct Consent Forms be sent to the Clerk of Court.") (internal citations

omitted); *Hallissey v. America Online, Inc.*, 2008 U.S. Dist. LEXIS 18387, \*11 (S.D.N.Y. Feb.

19, 2008) ("[a]lso, both notices must instruct the former CLs to submit any written consents to

the Clerk of the Court only").

Plaintiffs proposed plan of distributing the notice is inappropriate because notice should be distributed by a third party claims administrator to protect the privacy rights of the potential collective action members.  Third party claims administrators are routinely used in these types of cases and can easily be identified and agreed upon by the parties.  Utilizing a third party claims administrator to facilitate sending notices will fulfill several important objectives: (i) it will preserve the privacy rights of other current and former captains, bussers, runners, and waiters, who will decide for themselves whether to disclose their personal information to Plaintiffs' counsel; (ii) it will ensure that notice is mailed in a timely fashion; (iii) it will ensure that only the Court authorized notice is distributed to these individuals; and (iv) it will reduce the likelihood that Plaintiffs' counsel will engage in aggressive and one-sided solicitation and recruitment efforts directs to individuals who choose not to respond to the Court authorized notice.

Defendants cannot conceive of any reason why using a third party claims administrator to mail the notice would be prejudicial to any legitimate litigation objective.

### IV.   CONCLUSION

For the reasons stated in this Memorandum, Defendants respectfully request that Plaintiffs' Motion for Conditional Certification be denied.

Dated:  January 6, 2014
          New York, New York

LITTLER MENDELSON, P.C.

/s/ Craig Benson_____
Craig R. Benson, Esq.
Sarah E. Moss, Esq.
900 Third Avenue
New York, NY 10022
Telephone: (212) 583-9600

*Attorneys for Defendants*

23