UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JORGE FONSECA and REYES ANDON on behalf of themselves and others similarly situated, | Index No. 13-CV-5124 (AT) |
| Plaintiffs, | **Oral Argument Requested** |
| -against- | |
| DIRCKSEN & TALLEYRAND INC. d/b/a RIVER CAFE and MICHAEL "BUZZY" O'KEEFE, | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

LITTLER MENDELSON, P.C.
900 Third Avenue
New York, New York 10022

*Of Counsel*
Craig R. Benson
Sarah E. Moss

# Table of Contents

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.    BACKGROUND FACTS ................................................................................... 1

   A.   The River Café ........................................................................................... 1

   B.   Staffing at the River Café ......................................................................... 1

   C.   The River Café's Hiring and Termination Process .................................. 3

   D.   The Tip Pool .............................................................................................. 4

   E.   The River Café's Time-Keeping System ................................................. 5

III.   ARGUMENT ..................................................................................................... 6

   A.   Plaintiffs Cannot Satisfy the Class Action Prerequisites Under FED. R. CIV. P. 23(a) ....... 6

      1.   Plaintiffs Have Not Shown That Their Proposed Classes Present Common Questions With Common Answers .................................................. 7

        (a)   Whether Plaintiffs Were Improperly Required To Share Tips With Tip-Ineligible Employees Cannot Be Answered on a Common Basis .................................. 8

        (b)   Whether Defendants Paid Class Members For Fewer Hours Than They Worked Cannot Be Answered On A Common Basis ................................... 11

        (c)   Whether Defendants Failed To Provide Notice Of The Tip Credit To Class Members Cannot Be Answered On A Common Basis .......................... 15

      2.   Plaintiffs Are Not Adequate Class Representatives Because The Proposed Classes Conflict With This Court's Prior Order And Contain An Unavoidable Conflict of Interest 16

   B.   Plaintiffs Do Not Satisfy the Requirements Of Rule 23 Because Individual Issues Predominate Over Common Questions ....................................................... 18

      1.   Plaintiffs Have Not Demonstrated Predominance With Respect To Their Tip Pool Claims .......................................................................... 20

      2.   Plaintiffs Have Not Demonstrated Predominance With Respect To Their Unpaid Wage Claims ....................................................................... 21

      3.   Plaintiffs Have Not Demonstrated Predominance With Respect To Their Proposed Subclass ............................................................................. 22

      4.   Judicial Economy Would Not Be Served By Permitting This Matter To Be Litigated As A Class Action ......................................................... 23

   C.   The Proposed Notice Is Materially Deficient ......................................... 24

IV.   CONCLUSION ............................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

**CASES**

Chan v. Sung Yue Tung Corp.,
    No. 03 Civ. 6048, 2007 WL 313483 (S.D.N.Y. Feb. 1, 2007) ................................................15

Comcast Corp. v. Behrend,
    133 S. Ct. 1426 (2013) ..............................................................................6, 18, 19, 20

Gillian v. Starjem Rest. Corp.,
    Case 1:10-cv-06056-JSR, Doc. No. 40 (S.D.N.Y. Mar. 21, 2011).........................................12

Gillian v. Starjem Rest. Corp.,
    No. 10 CIV. 6056 JSR, 2011 WL 4639842 (S.D.N.Y. Oct. 4, 2011).........................12, 13, 17

Glazer v. Whirlpool Corp.,
    678 F.3d 409 (6th Cir. 2012) ...............................................................................19

In re Initial Pub. Offering Sec. Litig.,
    471 F.3d 24 (2d Cir. 2006)...................................................................................6

In Re: US Foodservice Inc. Pricing Litig.,
    729 F.3d 108 (2d Cir. 2013)............................................................................6, 18

McGlone v. Contract Callers, Inc.,
    11 Civ. 3002 (AT), 2014 U.S. Dist. LEXIS 124612 (S.D.N.Y. Aug. 25, 2014) ....................12

Myers v. Hertz Corp.,
    624 F.3d 537 ...............................................................................................18, 20

Ross v. RBS Citizens, N.A.,
    667 F.3d 900 (7th Cir. 2012) ...............................................................................19

Turner v. Millennium Park Joint Venture, LLC,
    767 F. Supp. 2d 951 (N.D. Ill. 2011) .................................................................9, 10

Wal-Mart Stores, Inc. v. Dukes,
    131 S.Ct. 2541 (2011).............................................................................. passim

Whirlpool Corp. v. Glazer,
    133 S. Ct. 1722 (2013)...................................................................................6, 19, 20

**STATUTES**

28 U.S.C. § 2072(b) .......................................................................................20

ii

**OTHER AUTHORITIES**

FED. R. CIV. P. 23(a) ....................................................................................6, 7, 16, 18

FED. R. CIV. P. 23(a)(2) ...............................................................................................7

FED. R. CIV. P. 23 (a)(4) ...........................................................................................16

FED. R. CIV. P. 23(b)(3) ...........................................................................................18

## I.  PRELIMINARY STATEMENT

On October 1, 2014, Plaintiffs Jorge Fonseca and Reyes Andon ("Plaintiffs") submitted their motion to certify a class action under Rule 23 of the Federal Rules of Civil Procedure (the "Motion").  Defendants Dircksen & Talleyrand, Inc. and Michael O'Keeffe ("Defendants") submit this memorandum of law in opposition to Plaintiffs' Motion and respectfully request that the Motion be denied.

## II.  BACKGROUND FACTS

### A.  The River Café

The River Café is a restaurant in Brooklyn, New York overlooking the East River, with a view of Manhattan's eastern skyline.  It was established in 1977 by owner Michael O'Keeffe.  Ex. A, Declaration of Richard Dean, ¶ 3.[1]  In October 2012, it closed its public dining room as a result of severe damage sustained during Hurricane Sandy.  Id. at ¶ 4.  The River Café recently opened its dining room for limited public dining.  Id. at ¶ 5.

Scott Stamford has been the General Manager of the River Café since 1999.  Ex. B, Declaration of Scott Stamford, ¶ 2.  Mr. Stamford began working at the River Café as a valet when the River Café opened in 1977.  Id. at ¶ 3.  He was then promoted to bartender and, in 1999, was promoted to General Manager, a position that he has retained to date.  Id.

### B.  Staffing at the River Café

When the River Café was fully-functioning, it was open for lunch and dinner Monday through Saturday and was open for brunch and dinner on Sunday.  Id. at ¶ 4.  The hours of each shift varied, on a daily basis, based largely on when the guests arrived and how long they dined.  Most of the wait staff typically arrived for a lunch shift between 10:00 and 10:30 a.m. and left

---

[1] Unless otherwise stated herein, all exhibits are attached to the Declaration of Craig Benson ("Benson Dec."). Unless otherwise stated, all exhibits are attached to the Benson Dec.

between 3:00 p.m. and 4:30 p.m.  Id at ¶ 5.  The waiter scheduled to close the lunch shift generally began working at 11:00 a.m.  Id. at ¶ 6.  Wait staff typically arrived for a dinner shift between 4:00 and 4:30 p.m. and left between 11:00 p.m. and 12:00 p.m.  Id. at ¶ 7.  The closing waiter on the dinner shift would generally begin working between 5:00 and 5:15 p.m., though would sometimes begin working as late as 6:00 p.m. if the waiter was also the closing waiter for the lunch shift.  Id. at ¶ 8.

The River Café's dining room was staffed by waiters, back waiters, bussers, captains, bartenders, and maître ds.  Id. at ¶ 9.  Prior to the River Café's closure in October 2012, there were two maître ds who worked in the restaurant, Patrick Goubit and Javier Rodriguez.  Id. at ¶ 10.  The maître ds' job duties were integral to the overall service that was provided.  Their functions included, greeting guests, interacting with guests, organizing the dining room seating, running food, bussing food, handing menus to guests, and deciding where guests would be seated.  Id. at ¶ 11.  The maître ds would also make the front of house schedule.  Id

Until approximately 2011, bussers would rotate in a "floater" assignment that would assist the service by wiping off silverware to ensure that it was presentable and do general stocking duties of the dining room during the service.  Id. at ¶ 12.  This position, as it was a busser assignment, received a full busser share from the tip pool.  Id.  In or around 2011, captains and waiters approached Mr. Stamford about the creation of the floater assignment.  Id. at ¶ 13.  As it was integral to the service, the captains and waiters asked him to create a new floater position, whose responsibilities would be limited to wiping off the silverware to ensure that it was presentable.  Id. at ¶ 14.  The captains and waiters recommended a dishwasher named Elesio and, at their suggestion, Mr. Stamford offered the floater position to Elesio.  Id. at ¶ 15-16.  The idea to include Elesio in the tip pool was entirely the wait staff's, who decided to give Elesio half

of a busser's share of the tip pool, thereby enabling the rest of the wait staff to retain the other half of the busser's share of the tip pool.  Id. at ¶ 17.  Elesio did not perform dishwashing duties after he was elevated to the floater position.  Id. at ¶ 18.

The River Café does not employ an "expediter."  Id. at ¶ 19.  Rather, the River Café had a back waiter position, whose job duties were to run food from the kitchen to the dining room.  Id. at ¶ 20.  Plaintiff Reyes Andon and opt-in Mark James worked as back waiters in this capacity. Id. at ¶ 21.  Other waiters who worked in the front of the house would also sometimes work as back waiters, depending on the shift.  For example, Plaintiffs have identified Pedro Alonso as an individual who worked as an expediter. (See Plaintiffs' Motion for Conditional Certification, Docket No. 33 at 7.)  However, Mr. Alonso was also a front-of-house waiter – and therefore a member of Plaintiffs' proposed Class.   (Stamford Dec. at ¶ 22.)

During their employment at the River Café, Plaintiffs earned substantial annual income. For example, in 2012, Mr. Andon earned $63,703.27, Mr. Fonseca earned $72,877.44, Mr. Schuppert earned $62,584.33, Plaintiff Galil Gertner earned $67,817.26 in 2011, and  Plaintiff Mark James earned $70,504.74 in 2011. (Ex. C, D000526, D000541, D000545, D000546 and D000550.)

### C.    The River Café's Hiring and Termination Process

As the General Manager, Mr. Stamford conducts all of the hiring, including interviewing all candidates for front of house positions and making the decision to hire or not to hire each candidate.   Ex. B at ¶ 23.   Mr. Stamford received resumes from candidates and received recommendations directly from members of the wait staff.  Id. at ¶ 24.  Based on the candidate's resume, Mr. Stamford would make a decision whether to interview the candidate.  Id. at ¶ 25. Except in rare circumstances, Mr. Stamford interviewed all of the candidates.  Id. at ¶ 26.

Mr. Stamford would sometimes involve other members of the wait staff to translate if a candidate listed another language on his or her resume.  For example, when a candidate listed Spanish on his or her resume, former maître d Javier Rodriguez would be asked to speak with the candidate and confirm his or her proficiency.  Id. at ¶ 27.  This was not unique to maître ds; when a candidate listed Portuguese on his or her resume, Mr. Stamford would ask a captain named Silaine Sousa to speak with the candidate to confirm his or her proficiency.  Id. at ¶ 28.

After interviewing a candidate, Mr. Stamford would decide whether to offer the candidate a trial period at the River Café.  Id. at ¶ 29.  During the candidate's trial period, Mr. Stamford would speak with the wait staff, usually captains, about the candidate and whether the candidate was qualified for the position.  Id. at ¶ 30.  After the training period ended, Mr. Stamford made the decision whether to hire the candidate.  Id. at ¶ 31.  Mr. Stamford communicated the decision to the candidate, usually by telephone.  Id at ¶ 32.  The only time Mr. Stamford would ask another employee to communicate the decision was when the candidate's primary language was not English, in which case Mr. Stamford would ask someone from the wait staff who spoke that language to communicate the decision.  Id. at ¶ 33.  This had nothing to do with any managerial aspect of the roles in question – it was purely a matter of linguistics.

Similarly, Mr. Stamford and Mr. O'Keeffe make all termination decisions for front of house staff at the River Café.  Id.  at ¶ 34.  Typical reasons for termination include poor service, theft, tardiness, and customer complaints.  Mr. Stamford personally investigates customer complaints by speaking with members of the wait staff, and makes a disciplinary determination based on his investigation.  Id.

### D.    The Tip Pool

The tip pool at the River Café was created by the wait staff when the restaurant opened.

4

The tip pool is completely operated and maintained by the wait staff without the involvement from the restaurant's management.  Id. at ¶ 35.  To Defendants knowledge, Plaintiff Reyes Andon was one of the waiters in charge of counting and distributing the tips.  Id. at ¶ 36.  Like waiters and captains, the maître ds were among the service employees who received tips directly from customers.  These tips became part of the tip pool, which were redistributed to other members of the wait staff.  Id. at ¶ 37.  On information and belief, the maître ds received more than $30 per month in tips directly from customers.  Id. at ¶ 38.

Changes to the tip pool were entirely within the control of the service staff.  They had complete discretion of which positions were included and the shares that were provided to participants.  Id. at ¶ 39.  The wait staff could also change how the tip pool money was distributed.

### E.      The River Café's Time-Keeping System

The River Café has a time clock that employees are encouraged to use in order to record their work time.  Dean Dec. ¶ 6.  Employees who utilize the time-keeping system are paid in accordance with their time records.  Id. at ¶ 7.  Approximately one-third of the River Café's employees utilize the time clock system.  (Ex. D, Deposition of Brendan McGinn, 33:18-20.) Except for bartenders and captains, wait staff who fail to clock in and out are paid for five (5) hours for a week-day lunch shift (Monday-Friday) and six (6) hours for a Saturday or Sunday lunch shift.  Ex. B at ¶ 8.  Wait staff who fail to clock in and out, except for bartenders and captains, are paid for eight (8) hours for a dinner shift, regardless of on which day of this week the shift occurs.  Id.  Bartenders are paid eight (8) hours for a single shift and twelve (12) hours for a double shift.  Id. at ¶ 9.  Captains are paid for seven (7) hours for each shift.  Id. at ¶ 10. The shift pay is designed to provide, at least, the applicable minimum wage for all hours of work.

Id. at ¶ 11.  No employee has ever complained to Mr. Stamford about not being paid for hours worked.  Stamford Dec. ¶ 40.  Typically, new employees use the River Café's time-keeping system, which is integrated with the River Café's point of sale system, for the first month or so of employment, then stop, presumably because they are paid more by not clocking in and receiving the shift pay.  Dean Dec. ¶ 12.

## III.    ARGUMENT

### A.    Plaintiffs Cannot Satisfy the Class Action Prerequisites Under FED. R. CIV. P. 23(a)

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." In Re: US Foodservice Inc. Pricing Litig., 729 F.3d 108, 117 (2d Cir. 2013) (quoting Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013)).  "Federal law permits individual claims to be litigated as a class action provided that the party seeking certification 'affirmatively demonstrates his compliance with Rule 23.' The party must establish that the four threshold requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – are satisfied and demonstrate 'through evidentiary proof' that the class satisfies at least one of the three provisions for certification found in Rule 23(b)." Id.

In the Second Circuit, courts must rigorously assess the Rule 23 requirements, resolve factual disputes, and assess the merits of a plaintiff's claims to the extent they overlap with Rule 23's requirements.  See In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006).  In Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541 (2011) and Comcast, 133 S. Ct. at 1432, the Supreme Court confirmed that this was the appropriate level of scrutiny.  In Dukes, a case that focused on the applicable standard involved in Rule 23(a)'s commonality requirement, the Court emphasized the necessity of a "rigorous analysis" that "will entail some overlap with the merits of the plaintiff's underlying claim." Dukes, 133 S. Ct. at 2551.  In Comcast, a case that focused

on the applicable standard involved in Rule 23(b)'s predominance requirement, the Court made clear that "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than" Rule 23(a)'s "rigorous" standard.  Comcast, 133 S. Ct. at 1432.

Because Plaintiffs cannot satisfy the requirements of Rule 23, their motion for class certification must fail.

1.  Plaintiffs Have Not Shown That Their Proposed Classes Present Common Questions With Common Answers

In order to certify a class action under Rule 23(a)(2), Plaintiffs have to demonstrate, inter alia, that "there are questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2). Commonality requires each putative class member's claim to "depend upon a common contention" whose "truth or falsity will resolve an issue central to the validity of each one of the claims in one stroke." Dukes, 131 S.Ct. at 2551. "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (citation omitted).

Dukes stresses that the question of whether class members share a common legal injury for Rule 23(a) purposes does not turn on what law(s) their claims arise under (i.e., the NYLL) or the violation presented (e.g., failure to pay overtime), but "whether all their claims can be productively litigated at once."  Id. at 2551. Dukes instructs that "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers." Dukes, 131 S. Ct. at 2551.  To that end, Dukes instructs that courts should not focus on "common questions" because "[a]ny competently crafted class complaint literally raises common questions."  Id. at 2551 (internal quotations omitted).  Instead, "[w]hat matters to class certification . . . [is] the capacity of a classwide proceeding to generate common answers apt to

drive the resolution of the litigation." Id.  In other words, commonality requires plaintiffs to proffer "some glue" in the form of an overall unlawful policy that ties a defendant's unlawful actions together, so that the common question can be resolved "in one stroke," generating a common answer.  Id. at 2551-53.  In the absence of such proof, the commonality threshold, let alone predominance under Rule 23(b)(3), cannot be met.

Plaintiffs identify a number of "common questions," but Dukes instructs that only common questions that are "central to the validity of Plaintiffs' claims" are acceptable.  131 S. Ct. at 2545.  Here, the only relevant central questions offered by Plaintiffs are: (i) whether Plaintiffs were required to share their tips with tip-ineligible employees; (ii) whether Plaintiffs were compensated for all time worked; and (iii) whether Plaintiffs received adequate notice of the tip credit.  Plaintiffs have failed to establish the requisite commonality because they have not demonstrated that their purportedly common questions are susceptible to common answers. Rather, their own testimony establishes that the answers to each of those questions varies significantly from position to position, person to person, day to day, shift to shift, and customer by customer.  As a result, none of these questions can be answered "in one stroke" as to any of the Class Members, much less all of them at once.  For these reasons, as set forth more fully below, class certification should be denied.

> (a)  *Whether Plaintiffs Were Improperly Required To Share Tips With Tip-Ineligible Employees Cannot Be Answered on a Common Basis[2]*

By claiming that certain class members, when performing certain job responsibilities, are ineligible for the tip pool, Plaintiffs have doomed their certification motion.  Plaintiffs found five ways to ask the same question – whether Class Members were required to share their tips with

---

[2] Although Defendants maintain that the maître ds, floaters, and expediters were tip eligible positions, for purposes of this memorandum, Defendants accept as true Plaintiffs' contention that none is tip eligible.

employees who were not eligible to receive tips.  (Plaintiffs' Memo at 17.)[3]  This question cannot be answered on a common basis because, if Plaintiffs are correct, whether any Class Member was (a) tip eligible on any given day or (b) required to share tips with an ineligible employee requires a person by person, position by position, day by day, shift by shift inquiry.

Plaintiffs assert NYLL claims allegedly arising out of the tip pool in effect at the River Café.  See Plaintiffs' Memorandum of Law in Support of Class Certification ("Plaintiffs' Memo." at 3 ("The Restaurant is a pooled house; in other words, all tips are put into a pool and the pool is then distributed to employees.").  Tip pooling occurs when tips are pooled and redistributed among the tipped employees.  Ex. E, N.Y. DEPT. OF LABOR OPINION LETTER RO-08-0049.  A tip pooling arrangement is undertaken on a voluntary basis and, as such, employees may include those persons they wish to include in such tip pool as long as the members of the tip pool all receive tips.  Id.

As an initial matter, the determination of whether certain employees may participate in a valid tip pool, necessarily becomes an individualized question, unique to each class member's consent to whether it was acceptable to share tips with the included positions in the tip pool.  See Turner v. Millennium Park Joint Venture, LLC, 767 F. Supp. 2d 951, 945-55 (N.D. Ill. 2011) ("it is readily understandable that employees receiving tips directly from customers may agree to share tips when they believe that the employees with whom they share help them to serve the customers better and more fully and thus to obtain additional tips and sweeten the pot for everyone.")  Given the required individualized inquiry as to each employee's individual consent to the positions included in the tip pool, a finding with respect to a class representative does not

---

[3] Although Plaintiffs parse out this question into 5 separate questions (see Plaintiffs' Memo at 17), each of these questions – whether "management employees," "maître ds," non-service employees," "expediters," or "polishers" were eligible to participate in the tip pool – all get at the same question of whether Plaintiffs were required to share their tips with employees who were not tip eligible.  These present the same underlying question and should be analyzed together and rejected for the same reasons.

mandate the same finding for every class member.  This variance is highlighted by Plaintiffs' testimony, which demonstrates differences in each employee's belief as to whether certain individuals could participate in the tip pool.

For example, despite moving for class certification, in part, because the tip pool included back waiters (characterized by Plaintiffs as expediters), Plaintiffs Reyes Andon – who worked as a back waiter/expediter – certainly believes that tips were properly shared with him when he was a back waiter/expediter.  He expressly testified that he believes he <u>was tip eligible</u> for at least some of the shifts he worked as a back waiter/expediter.  (Ex. F, Deposition of Reyes Andon, 103:10-13). Other class members may not feel the same way.

Moreover, Defendants have provided unrefuted testimony that the floater position – which is also being challenged – was included in the tip pool at the request of some of the wait staff.  Plaintiffs' tip pool claims also fail because the position at issue was included at the tip pool at the service staff's behest.  Having already received the benefit of that bargain, in the form of retaining a greater share of tips for themselves and enabling them to avoid having to rotate in to the floater assignment, Plaintiffs now seek to disavow this arrangement for yet more financial gain.  <u>Turner v. Millennium Park Joint Venture, LLC</u>, 767 F. Supp. 2d 951, 945-55 (N.D. Ill. 2011) squarely addressed this issue and is instructive here.  Plaintiffs' testimony that at least some of them did not consent to this arrangement merely highlights the discrepancy in consent among the putative class.

In addition, the requisite commonality is lacking because, individual inquiries will be needed to determine whether any given employee was tip eligible, and thus even eligible to be a class member.  In New York, a restaurant employee is not tip eligible when he spends more than 20% of his shift <u>or</u> two hours, whichever is less, working in a non-tipped position.  N.Y.C.R.R §

146-2.9; 146-3.3; 143-3.4.  This inquiry involves the length of the shift and exactly how much time is spent in allegedly non-tip-producing work.  Importantly, this inquiry is on a <u>daily basis</u> – in any given week, an employee may alternate between being tip eligible and ineligible.  <u>See</u> N.Y.C.R.R 146-3.4.  Thus, whether any class member who rotated in and out of these allegedly ineligible positions – including the maître ds[4] – is eligible for tips requires an individual by individual determination.  Every shift is different.  Every day is different.  Timing is critical and minutes can matter.   It is simply not possible to make any determination in this regard without getting into very specific individualized testimony.

For example, Plaintiffs assert that expediters and floaters are not tip eligible.  Yet, servers (part of the class) and bussers (part of the class) rotate into those positions, respectively. Whether any class member was ineligible to receive tips on any given day would require an individual by individual, shift by shift inquiry.  This question is simply incapable of being answered on a representative basis because the factors that determine liability can only be ascertained on an individual basis.  Simply answering the question of whether expediters are (a) tip ineligible and (b) were forcibly included in the tip pool by the River Café, does nothing to resolve the question of liability – much less damages – on a class-wide basis.

> (b)     *Whether Defendants Paid Class Members For Fewer Hours Than*
> *They Worked Cannot Be Answered On A Common Basis*

Plaintiffs also claim that they were not paid for all regular and overtime hours worked because they were paid on a shift rate rather than on an hourly rate basis.  They claim that they, and the proposed Class, have the common question of "Whether Defendants illegally paid Tipped Employees for less (sic) hours than they worked."  (Plaintiffs' Memo at 17.)  Once again,

---

[4] For the reasons set forth in their Memorandum of Law in Support of Motion for Summary Judgment, Defendants firmly believe that the maître ds were at all relevant times tip-eligible employees and lawful tip pool participants. However, to the extent that this Court believes it is a question of fact, class certification on that issue is inappropriate for the same reasons set forth in this Section.

this is not a question that lends itself to the requisite common answer.  Here, as will be demonstrated below, multiple factors impact whether any particular individual was not paid for regular or overtime hours, including that individual's position, what type of shift it was, what day of the week the shift took place, when the individual started working, whether the individual partook of the family meal and, if so, for how long, and when the individual stopped working. Moreover, the answer to that question for even a single individual necessarily varies from day to day, position to position, week to week, and month to month. These individual questions, which go to the heart of any potential liability, will invariable dominate any questions common to the class. See Gillian v. Starjem Rest. Corp., No. 10 CIV. 6056 JSR, 2011 WL 4639842, at *6 (S.D.N.Y. Oct. 4, 2011)  (denying class certification of NYLL wage claims, in part, because "the number of hours each individual worked on a particular shift, as well as the number of hours each individual worked in a particular week."

First, even Plaintiffs' articulated standard for determining whether any particular Class Member has a claim for unpaid wages will require a highly individualized inquiry.  Plaintiffs assert that, because of Defendants' practice of paying Plaintiffs and putative class members a flat rate rather than to the minute, an employee may rely on his own testimony that he was, or was not, improperly compensated.  See Plaintiffs' Memo at 11.  By definition, this is inherently an individualized inquiry because each employee must "prove[] that he has in fact performed work for which he was improperly compensated."  Id., quoting McGlone v. Contract Callers, Inc., 11 Civ. 3002 (AT), 2014 U.S. Dist. LEXIS 124612, at *13-14 (S.D.N.Y. Aug. 25, 2014).  Plaintiffs do not even suggest there is any uniformity or commonality in this respect.

Class certification has been denied in similar cases.  For example, in Gillian v. Starjem Rest. Corp., Case 1:10-cv-06056-JSR, Doc. No. 40 (S.D.N.Y. Mar. 21, 2011) the plaintiffs

sought class and conditional certification of their unpaid minimum and overtime wage claims, which were premised in part on allegations that the plaintiffs were paid shift pay, which resulted in them being allegedly under- or uncompensated for all hours worked.  Id. at 4 ("Defendants pay tipped employees a set number of hours for each shift worked").   The Gillian plaintiffs alleged that they were paid five (5) or six (6) hours per shift, regardless of actual shift length.  Id. at 5.  The court denied the plaintiffs' motion for certification of their unpaid wage claims, finding that whether the defendant's shift pay policy actually violated the law was dependent on each individual, the number of hours he worked on a particular shift, and the number of hours he worked each week.  Id.at 19.  In sum, whether there was an actual legal violation was not a question that could be answered uniformly on behalf of the plaintiffs and the class, and was therefore inappropriate for conditional – much less class – certification.

Here, like Gillian, Plaintiffs allege that they were paid shift pay, in this case, five (5) hours for working a lunch shift and eight (8) hours for working a dinner shift.  While this, in itself, would warrant denial of certification, there is not even uniformity with respect to this practice.  Plaintiffs fail to mention several other alternative ways in which they and members of the putative collective are paid.  For example, the wait staff – except bartenders and captains – were paid for five (5) hours for lunch shifts Monday through Friday.  For lunch shifts on Saturday and Sunday, they were paid for six (6) hours.  Wait staff – again, except for bartenders and captains – were paid for eight (8) hours for a dinner shift, regardless of what day the shift occurred.  By contrast, captains were paid for seven (7) hours per shift, regardless of the shift.  Bartenders' pay was also different; they received pay for eight (8) hours for a single shift and twelve (12) hours for a double shift.  Not to mention the one-third of River Café employees who actually used the time clock system to punch in and out.  There is anything but commonality with

respect to the putative class.

By way of example, whether a NYLL violation occurred depends not only on the individual, the day, the shift, and the week, as well as on the individual's position and type of shift pay he or she received. A 6-hour lunch shift on a Monday might result in a violation for a busser, but would not be a violation for a bartender or a captain. Plaintiffs themselves identified several factors that would impact whether any Plaintiff or class member was ever underpaid, including position (Ex. G, Deposition of Geoff Schuppert, 60:2-21) (waiters arrived earlier than captains for lunch shifts); whether the individual was closeng (ending) the shift (id., 61:18-62:8) (closing waiters worked one hour longer than non-closing waiters); and the idiosyncrasies of any particular shift (id., 63:6-15) (how late any particular individual stayed varies by shift). It is impossible to know, without examining each individual employee, whether this practice resulted in a NYLL violation for any Plaintiff, much less all Class Members, rendering Plaintiffs' claims unsuitable for class treatment.

Third, as noted above, some – but not all – putative class members were paid a flat amount of hours per shift, with the number of hours varying by shift, such as 8 hours for every dinner shift. Even accepting Plaintiffs' testimony as true, their testimony demonstrates that, at best, sometimes they worked more than 8 hours and sometimes they did not. For example, Mr. Schuppert testified that he worked from 5:00 p.m. to sometime between "midnight and 2." Id., 120:12-21. Thus, he worked anywhere from 7 hours to 9 hours on any given dinner shift. As another example, Plaintiff Laurencio Cordova (a busser) testified that he would start working a brunch shift at 10:30 a.m., stop working from 10:30-11:00 to eat the family meal, and then continue working until 3:30. (Ex. H, Deposition of Laurencio Cordova, 51:11-53:23.) As noted above, Plaintiffs were paid 6 hours for a Sunday brunch shift; thus the River Café would actually

overpay Mr. Cordovo by up to 1.5 hours when he worked a brunch shift.  In both of these scenarios, not only would Defendants not be liable for unpaid regular wages for that particular day, but would be entitled to an off-set against other days in which week when they may have worked longer hours.

Fourth, since overtime is calculated on a weekly basis, not daily, it is not enough just to look at whether a Plaintiff or class member worked longer than 8 hours on any given dinner shift. The parties must also examine how long that Plaintiff worked on every other shift that week, in order to determine whether Plaintiff was underpaid at all.

Accordingly, because the question of whether Plaintiffs and Class Members were paid for all hours worked cannot be answered "in on stroke," class certification should be denied.

*(c)*  *Whether Defendants Failed To Provide Notice Of The Tip Credit To Class Members Cannot Be Answered On A Common Basis*

Plaintiffs seek certification of a subclass of tipped employees employed by Defendants prior to January 1, 2011 based on the claim that they did not receive the requisite notice of the tip credit that was being taken.  (Plaintiffs' Memo at 12.)  However, Plaintiffs' own testimony has established that whether any employee was provided – or not – with adequate notice of the tip credit is highly individualized and will require the testimony of each individual Plaintiff and Class Member as to his or her awareness of the tip credit and tipped minimum wage rate at the time of their hire.  Because the applicable standard for whether an employee received adequate notice, so an employer could take the tip credit, is invariably an individualized determination, individual questions will predominate over common questions.

Prior to January 1, 2011, an employer could establish that it had informed employees of their wages by "for example, providing employees with a copy of § 203(m) and informing them that their tips will be used as a credit against the minimum wage as permitted by law." Chan v.

15

<u>Sung Yue Tung Corp.</u>, No. 03 Civ. 6048, 2007 WL 313483, at *18 (S.D.N.Y. Feb. 1, 2007). Whether an employee was informed that their tips would be used as a credit is inherently an individualized question.  For example, Mr. Andon testified that he knows the difference between wages and tips, and that when he first started working at the River Café, he received an hourly wage rate of "$4 and change" which then increased to "$5 and change."  (Ex. F, 36:12-14; 47:5-17.)  He then testified that he knew he was receiving less than the minimum wage rate because he was also receiving tips.  (<u>Id</u>., 100:3-10.)  Mr. Schuppert testified that he knew when he was hired at the River Café that he would be paid a reduced hourly rate because he received tips. (Ex. G, 41:2-42:9.)

Mr. Andon and Mr. Schuppert's testimony demonstrate that whether any particular employee had notice of the tip credit will require a person-by-person examination, to determine whether they were informed about the tip credit and what their understanding was as to the tipped minimum wage rate.  For these reasons, individual questions will inevitably overwhelm the allegedly "common bond" of whether they received proper wage notification.

Plaintiffs have failed to establish that any of their common questions are capable of resolution "in one stroke," as required by Fed R. Civ. P. 23(a) and <u>Dukes</u>.  Rather, the answers to the common questions can only be resolved with individual by individual, day by day, shift by shift examination.  The dissimilarities between Plaintiffs and Class Members in terms of length of shift, amount paid, and tip eligibility will inevitably "impede the generation of common answers" (<u>Dukes</u>, 131 S. Ct. at 2551).  Thus, Plaintiffs' motion for class certification should be denied.

2.      <u>Plaintiffs Are Not Adequate Class Representatives Because  The Proposed Classes Conflict With This Court's Prior Order And Contain An Unavoidable Conflict of Interest</u>

According to FED. R. CIV. P. 23 (a)(4), "the representative parties" must "fairly and

adequately protect the interests of the class."   Plaintiffs cannot satisfy this requirement with regard to their tip pool claims (non-service employees participating in the tip pool).

There is an inherent conflict of interest between the bussers who also worked as floaters and servers who also worked as back waiters/expediters.   This Court recognized this conflict in its decision granting 216(b) conditional certification, finding that "there is a conflict of interest between current bussers (who rotate into the floater position) and current front-of-house servers (who rotate into the expeditor/back-waiter position) and the other members of the putative collective; thus, they may not joint the collective action."   <u>See</u> Docket Entry 48 at 4.

Indeed, the named plaintiffs seek relief that may adversely affect some of the individuals they purport to represent – including themselves.   For example, in order to recover allegedly misappropriated tips, Plaintiff Andon will be required to demonstrate that he is tip eligible. However, he admits that during lunch shifts he spent half his time working as an expediter (allegedly tip ineligible) and half working as a food runner (tip eligible).   (Ex. F, 103:10-24.)   As discussed further in Section III.B.1, <u>infra</u>, this evidence puts Mr. Andon in the uncomfortable position of having to argue that he was tip eligible even when working in this allegedly half-and-half role.

Judge Rakoff refused to certify a class under similar facts.   In <u>Gillian v. Starjem Rest. Corp.</u>, 2011 WL 4639842, the plaintiffs alleged that stockers and expediters did not participate in service and thus were not entitled to participate in the tip pool. However, there, the stocker position was rotated among busboys and the expediter position was rotated among runners, and busboys and runners were included in the proposed class.   Accordingly, Judge Rakoff held that the plaintiffs could not fairly represent busboys and runners, because busboys and runners also serve as stockers and expediters and thus had an interest in their participation in the tip pool

being validated.  Id. at *6.

Here, Plaintiffs – and their counsel – will, depending on the day and their particular assignment, inevitably be torn about how to balance the competing interests of the class members.  In order to recover tips, Plaintiffs will be pitted against one another with respect to their tip eligibility.  For these clear conflict of interest reasons, Plaintiffs are not appropriate class representatives.

**B.**     **Plaintiffs Do Not Satisfy the Requirements Of Rule 23 Because Individual Issues Predominate Over Common Questions[5]**

In addition to the requirements under Rule 23(a), in order to certify a class action under Rule 23, Plaintiffs have to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members."  FED. R. CIV. P. 23(b)(3). This "requirement is [only] satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" Myers v. Hertz Corp., 624 F.3d 537, 547.  Comcast imposes an enhanced "duty to take a 'close look'" into whether common issues actually predominate under Rule 23(b)(3), including whether the action can be tried in a representative fashion.  133 S. Ct. at 1432.

"To certify a class pursuant to Rule 23(b)(3), a plaintiff must establish: (1) predominance – 'that the questions of law or fact common to class members predominate over any questions affecting only individual members'; and (2) superiority – 'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" In Re: US Foodservice Inc. Pricing Litig., 729 F.3d at 117 (quoting FED. R. CIV. P. 23(b)(3)).

---

[5] The same factors destroying commonality between the putative Class Members similarly destroy the predominance of common inquiries over individual inquires.

Comcast also clarified that the predominance inquiry must also include an assessment of how damages play into the overall case.  In Comcast, the plaintiffs brought a Rule 23(b)(3) class action against the defendant, alleging various violations of federal antitrust law.  The district court granted class certification as to liability and damages, specifically holding that damages could be calculated on a class-wide basis.  The Third Circuit affirmed, and defendant appealed. The Supreme Court reversed, holding:

> [I]t is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance:  Questions of individual damage calculations will inevitably overwhelm questions common to the class.

Comcast, 133 S. Ct. at 1433.   The plaintiffs' failure to provide a class-wide method for determining damages meant that individual damages inquiries were necessary.  The Court found that these inquiries would inevitably overrun the only common bond between the putative class members – the alleged antitrust violation.  Id.  Thus, the Supreme Court denied class certification as to the entire case, encompassing both liability and damages.

Only a short time later, the Supreme Court issued grant, vacate, and remand ("GVR") orders "in light of Comcast" in Whirlpool Corp. v. Glazer, 133 S. Ct. 1722 (2013), and RBS Citizens, N.A. v. Ross, 133 S. Ct. 1722 (2013).  In Whirlpool, the Sixth Circuit had affirmed the district court's decision to certify a liability-only class.  See Glazer v. Whirlpool Corp., 678 F.3d 409, 421 (6th Cir. 2012).  In Ross, the Seventh Circuit had affirmed the district court's decision to certify a liability and damages class in an overtime misclassification case.  See Ross v. RBS Citizens, N.A., 667 F.3d 900, 910 (7th Cir. 2012).  The Ross court did not analyze potential individual damages issues in its decision.  Id.

<u>Comcast</u> and the Supreme Court's GVR orders in <u>Whirlpool</u> and <u>Ross</u> make it clear that damages matter in the overall Rule 23 certification inquiry.  In <u>Comcast</u>, the Supreme Court reversed class certification altogether – as to both liability and damages – because individual damages issues predominated over common liability and damages issues.  And then, in <u>Ross</u> and <u>Whirlpool</u>, the Supreme Court issued GVR orders, instructing the circuit courts to apply its holding in <u>Comcast</u> to their decisions to certify classes.  Tellingly, in <u>Whirlpool</u>, <u>damages had never been certified</u>, leading to the conclusion that the Supreme Court intended for the Sixth Circuit to examine <u>Comcast</u>'s effect on the liability-only portion of its decision and predominance as a whole.

As demonstrated below, class certification is unwarranted because Plaintiffs have not demonstrated that common questions and common answers predominate over individual questions and individual answers.  <u>See</u> Section III.A.2, <u>supra</u>.

1.   <u>Plaintiffs Have Not Demonstrated Predominance With Respect To Their Tip Pool Claims</u>

As discussed in Section III.A.2(a), supra, Plaintiffs assert NYLL claims allegedly arising out of the tip pool in effect at the River Café and identify the common question as whether all of the Class Members were required to distribute their tips with ineligible employees.  Resolution of this question requires such a highly individualized inquiry into (i) whether any Plaintiff or Class Member agreed to share their tips with an ineligible employee; and (ii) whether any Plaintiff or Class Member was himself tip eligible on any given day. Moreover, Defendants' defenses will necessarily vary from individual to individual, depending, for example, on the person's position, which shifts they worked, and for how long they were employed by the River Café.

Neither question can be answered with "generalized proof" nor through generalized

defenses.   Further, made clear that "courts must consider potential defenses in assessing the predominance requirement." Myers, 624 F.3d at 551.  As the Dukes Court made clear "the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'" Dukes, 131 S. Ct at 2561 (quoting 28 U.S.C. § 2072(b)).  Rule 23 does not allow a court to employ novel methods in violation of the Rules Enabling Act.  "[A] class cannot be certified on the premise that [the employer] will not be entitled to litigate its statutory defenses to individual claims." Id.

Defendants have already presented evidence that (i) at least some Plaintiffs and putative Class Members may not be tip eligible; and (ii) at least some putative Class Members consented to the inclusion of the maître ds, expediters, and floaters.  Defendants would be deprived of their right to assert these individual defenses at trial, should the case proceed as a Class Action.  In short, there is no one answer to each "common" question; the answers are nuanced, fact-specific, and variable based on the person, day, shift, and guest.  These individual variables would inevitably overwhelm the common inquiries.

For these reasons, as well as those set forth in Section III.A.2(a), supra, individual questions predominate over generalized questions, and class certification should be denied.

2.      Plaintiffs Have Not Demonstrated Predominance With Respect To Their Unpaid Wage Claims

As discussed in Section III.A.2(b), supra, Plaintiffs claim that they were not paid for all regular and overtime hours worked. They assert that this claim can be adjudicated on a representative basis.  This is wrong.  Whether any individual was underpaid for regular and/or overtime hours can only be determined through an individual by individual, day by day inquiry. When an employee worked, for how long, and how much he was paid varies by individual, day of the week, type of shift, employee position, and whether the individual utilized the time clock.

These individual questions, which go to the heart of any potential liability, will invariably dominate any questions common to the class.  Tellingly, Plaintiffs have not offered a suggestion as to how these variables could possibly be litigated on a representative basis, much less how damages could be calculated.

Accordingly, because class issues with respect to unpaid minimum and/or overtime wages do not predominate over individual issues, class certification should be denied.

3.    Plaintiffs Have Not Demonstrated Predominance With Respect To Their Proposed Subclass

As discussed in Section III.A.2(c), <u>supra</u>, Plaintiffs seek certification of a subclass of tipped employees employed by Defendants prior to January 1, 2011.  Plaintiffs claim that this subclass is susceptible to class treatment because no employees received adequate notice of the tip credit prior to January 1, 2011.  This is incorrect.  As detailed above, the applicable standard for whether an employee received adequate notice, such that an employer could take the tip credit, turns on whether an employee was informed of his or her statutory rights.  Plaintiffs have testified that they were apprised of these rights – they knew from the beginning of their employment with the River Café that they received the tipped minimum wage because they also received tips.  Thus in order to answer the question of whether Subclass Members did not receive adequate notice of the tip credit, Defendants would have to – and would be entitled to – ask each individual Subclass Member about his or her understanding of the tip credit at the time of hire at the River Café.  In short, Plaintiffs' testimony underscored that this question is not susceptible to generalized proofs.   This person-by-person inquiry would quickly overwhelm the common question itself.   For these reasons, as well as those discussed in Section III.A.2(c), <u>supra</u>, Plaintiffs have failed to demonstrate that generalized questions – and answers – with respect to the subclass will predominate over individualized inquiries, and certification of the Subclass

should be denied.

      4.      <u>Judicial Economy Would Not Be Served By Permitting This Matter To Be Litigated As A Class Action</u>

Finally, to certify a damages class pursuant to Rule 23(b)(3), a plaintiffs must show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Plaintiff's argument in favor of the requirement of superiority simply recites a string of cases with no application of those cases to the facts of this case.[6]  Their rote argument is unavailing.  Plaintiffs' opposition glaringly omits any detailed description of how the Court would try this matter, in which it must review whether or not each Plaintiff is performing exempt duties, in a manageable way.  The testimony overwhelmingly demonstrates that each individual Plaintiff and putative class member's experiences are disparate in ways that will determine Defendants' liability as to their individual claims.  This stands in stark contrast to Plaintiffs' conclusory claim that "the proposed class action will 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness of bringing about other undesirable results." (Plaintiffs' Memo at 27.)

Assuming the Court were to find liability, determining damages would be nearly impossible to manage.  A trial in this type of matter would require examination of every witness about every day and shift of his or her employment with the River Café.  Because FED. R. CIV. P. 23 class actions use an "opt-out" mechanism, the class sizes tend to be larger, and the trial would last for weeks on end as a result.  As set forth above, Plaintiffs' claims will require Defendants to

---

[6] For example, Plaintiffs claim that class certification is appropriate because the individual recovery is likely small. (Plaintiffs' Memo at 26).  However, these Plaintiffs were high income earners and their damages, should Plaintiffs prove correct on even one theory, may obtain significant damages.  (<u>See</u> Ex. C.) This also ignores the fee-shifting nature of wage claims, through which a plaintiff's counsel typically receive substantially all of their fees regardless of the plaintiff's recovery.

put on individual proofs, including testimony with respect to its assertion of the affirmative defenses for each member of the putative class.  This, in itself, renders it impossible for Plaintiffs to represent the putative class on a representative basis.  The only way to conduct this matter as a class action, without abridging Defendants' rights, would be to conduct mini-trials of more than 150 purported class members, rendering Rule 23 class certification completely inappropriate.

### C.   The Proposed Notice Is Materially Deficient

First, the section entitled "Remain in the Lawsuit" only refers to "money or other benefits that may come . . . of this class action lawsuit."  It does not make clear that the class member is also bound to any order and/or judgment that results in no money and/or other benefits.  This information is vital to ensuring that putative class members make an informed decision about whether to remain in or opt out of the class.   For the Court's convenience, Defendants recommend revising the section (new language in bold):

> If you do nothing in response to this Notice, you will remain a member of the Class.  This may allow you to receive money or other benefits that may come from a trial or settlement of this class action lawsuit**, though there is no guarantee that that money or benefits will ever be obtained**.[7]
>
> …
>
> If you remain in this lawsuit and the Plaintiffs succeed in proving the claims against the River Café **and receives a monetary award**, you will be notified about how to receive your share of the money.  **If Plaintiffs do not succeed in proving their claims and/or do not receive a monetary award, you will be bound by that judgment.**

Second, the Proposed Notice contains just 7 words about Defendants' position on the merits of Plaintiffs' claims.  Defendants request the opportunity to include a short statement of

---

[7] This language was in Plaintiffs' Proposed Notice of the 216(b) collective certification.  <u>See</u> Docket Entry 34-1.

its position on the litigation drafted by their own counsel.  For the Court's convenience, it is Defendants' position that the tip pool is voluntary and run by the employees, that all of the individuals who receive a distribution from the tip pool engage in customer service, and that all of the River Café's employees are correctly paid for all of the time they spent working at the Restaurant.

## IV.    CONCLUSION

For the reasons stated in this Memorandum, Defendants respectfully request that Plaintiffs' Motion for Class Certification be denied.

Dated:  October 31, 2014
          New York, New York

                                        LITTLER MENDELSON, P.C.

                                        /s/ Craig Benson
                                        Craig R. Benson, Esq.
                                        Sarah E. Moss, Esq.
                                        900 Third Avenue
                                        New York, NY 10022
                                        Telephone: (212) 583-9600

                                        *Attorneys for Defendants*